UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SALLY J. HAWKINS,             Case No. 1:05-CV-23

    Plaintiff,             Hon. Richard Alan Enslen

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

**OPINION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

The Commissioner determined that Plaintiff is not disabled as defined by the Act. For the reasons articulated herein, the Court concludes that the Commissioner's decision must be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citations omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 52 years of age at the time of the Administrative Law Judge's ("ALJ") decision. (Tr. 22). She successfully completed high school and worked previously as a salesperson, machine operator, and assembler. (Tr. 22, 84-88).

Plaintiff first applied for benefits on July 19, 1999, alleging that she had been disabled since May 19, 1999, due to depression, arthritis, and pain in her neck, back, hip, and arm. (Tr. 37-38). Her application was denied, after which time she requested a hearing before an ALJ. (Tr. 37). On March 13, 2001, Plaintiff appeared before ALJ William Musseman, with testimony being offered by Plaintiff and vocational expert Paul Delmar. (Tr. 510-35). In a written decision dated April 18, 2001, the ALJ determined that Plaintiff was not disabled as defined by the Act. (Tr. 37-44). Plaintiff did not appeal this determination.

Plaintiff again applied for benefits on August 20, 2002, alleging that she had been disabled since May 19, 1999, due to chronic post-traumatic stress disorder, major depression, inflammatory osteoarthritis, bursitis, and tendinitis. (Tr. 54-56, 75, 304-06). Her application was denied, after which time she requested a hearing before an ALJ. (Tr. 45-53, 307-20, 443-48). On March 25, 2004, Plaintiff appeared before ALJ B. Lloyd Blair, with testimony being offered by Plaintiff and vocational expert Heather Benton. (Tr. 474-509). In a written decision dated May 26, 2004, the ALJ determined that Plaintiff was not disabled as defined by the Act. (Tr. 21-30). The Appeals Council declined to review the ALJ's decision, rendering it the Commissioner's final

decision in the matter. (Tr. 7-10). Plaintiff subsequently appealed the matter in this Court pursuant to 42 U.S.C. § 405(g).

Before analyzing Plaintiff's claim, the Court must first clarify the boundaries of its subject matter jurisdiction. As noted above, Plaintiff first applied for benefits in 1999. This application was subsequently denied in a decision dated April 18, 2001. Plaintiff did not seek judicial review of this determination.

Except in cases presenting "a colorable constitutional issue," social security claimants are bound by the principles of *res judicata*. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 841 (6th Cir. 1997); *see also*, 20 C.F.R. § 404.957(c)(1). As previously noted, Plaintiff's prior application for benefits was denied. Because she did not challenge this decision, it became the Commissioner's final decision in the matter. *See* 20 C.F.R. § 404.987(a). While such final decisions may be reopened (and thus modified) under certain conditions, *see* 20 C.F.R. § 404.988, Plaintiff has not asserted that she satisfies any such condition, nor has she alleged that her claim presents a colorable constitutional issue warranting a relaxation of the application of *res judicata*.

Accordingly, the issue of Plaintiff's disability status through April 18, 2001, has been completely adjudicated on the merits to finality, and is not subject to further adjudication. *See McCoy v. Chater*, 81 F.3d 44, 46 (6th Cir. 1995); *see also*, 20 C.F.R. § 416.1450(f) (if a factual issue was previously decided "in a claim involving the same parties . . . the administrative law judge will not consider the issue again, but will accept the factual finding made in the previous determination or decision unless there are reasons to believe that it was wrong").

## MEDICAL HISTORY

X-rays of Plaintiff's pelvis, taken on March 30, 1999, revealed the presence of bursitis with "no evidence of acute abnormality." (Tr. 170). X-rays of Plaintiff's lumbar spine, taken the same day, revealed narrowing of L5-S1 disc space, but "no acute abnormalities." X-rays of Plaintiff's cervical spine, taken the same day, revealed degenerative disc disease and "mild" neural foraminal narrowing. (Tr. 170-71).

On April 13, 1999, Plaintiff was examined by Dr. Thomas Noll. (Tr. 161). Plaintiff reported that she was experiencing a burning pain down her sides. She also reported that she was experiencing constant back pain. (*Id.*) Plaintiff participated in a rheumatoid factor evaluation, the results of which were "negative." (Tr. 173).

On May 27, 1999, Plaintiff was again examined by Dr. Noll. (Tr. 154, 158). Plaintiff reported that she recently received an adjustment from her chiropractor, after which her back felt "better." (Tr. 158). Dr. Noll reported that Plaintiff was "an emotional wreck" and that her pain was "more emotional than physical." (Tr. 154). He concluded that because Plaintiff "cannot tolerate her job and her home situation," she was an "emotional cripple" who needed psychiatric assistance. (*Id.*)

On June 15, 1999, Dr. Noll completed a report regarding Plaintiff's physical abilities. (Tr. 155-57). Dr. Noll reported that during an eight-hour workday, Plaintiff could sit for four hours, stand for one hour, and walk for one hour. (Tr. 155). Dr. Noll reported that Plaintiff could occasionally lift/carry up to 20 pounds and could use her upper extremities to perform simple grasping activities. Dr. Noll reported that Plaintiff could occasionally bend, squat, kneel, and crawl. (*Id.*) Dr. Noll concluded that Plaintiff was capable of working, but simply needed to find a "different kind of job." (Tr. 155-57).

5

On August 25, 1999, Plaintiff was examined by Dr. Samardeep Gupta, with the Department of Rheumatology at the University of Michigan. (Tr. 145-46). Plaintiff reported that she was experiencing "generalized body aches and pain." (Tr. 146). An examination of Plaintiff's hands revealed clubbing, but x-rays revealed "no significant bone or joint abnormality" and "no radiographic evidence of osteoarthritis." (Tr. 146, 149). Plaintiff walked with a "normal" gait. (Tr. 146). An examination of her back revealed no tenderness and straight leg raising was negative. A musculoskeletal examination "failed to show any active synovitis in any of the joints" and "[h]er fibromyalgia points are nontender all over." The results of a neurological examination revealed "no focal neurological deficits." (*Id.*)

In a report dated November 24, 1999, Dr. Noll reported Plaintiff "has a significant overlay on her physical condition," but that "there is also a potential for improvement in her musculo-skeletal condition." (Tr. 152).

On December 1, 1999, Plaintiff was examined by Dr. Gupta. (Tr. 143-44). An examination of Plaintiff's right shoulder revealed the presence of bursitis; otherwise the results of the musculoskeletal examination were unremarkable. (Tr. 144). A neurological examination revealed numbness in Plaintiff's hands and "minimal sensory deficit" in her forearms. (*Id.*) The results of an EMG examination of Plaintiff's hands were "entirely negative" with no evidence that Plaintiff was suffering from carpal tunnel syndrome or cervical radiculopathy. (Tr. 142). An examination of Plaintiff's fibromyalgia trigger points revealed that they were all "nontender." (Tr. 144). Dr. Gupta concluded that Plaintiff suffered from bursitis and osteoarthritis. (Tr. 142).

Plaintiff began participating in physical therapy on February 23, 2000. (Tr. 130-31). She completed therapy on April 12, 2000, at which time the therapist reported the following:

6

> Patient flexibility around neck, shoulders, and lower trunk have improved with little discomfort while doing the exercises. There is still intermittent pain in [her] shoulders, and back and hips still have constant pain but down to a soreness now. Patient is walking with greater ease and able to tolerate more sitting time in front of a computer. Standing in one place is still a problem. Have shown patient some simple active exercise[s] to begin strengthening especially for lower trunk stability to take away some of the pain problem with static postures. Patient is in the 4/5 strength range, in general, now.

(Tr. 129).

On June 29, 2000, Plaintiff reported that her pain was "significantly better" with medication and physical therapy. (Tr. 140).

On October 10, 2000, Plaintiff reported that she was "really doing well" and was experiencing only "occasional discomfort." (Tr. 139).

In a letter dated November 9, 2000, John Bosker, a rehabilitation counselor with whom Plaintiff was working, reported that Plaintiff "is capable of substantial gainful work activity" and "can perform many different jobs in various industries." (Tr. 150).

On January 23, 2001, Plaintiff participated in a psychiatric assessment conducted by Dr. Fernando Castro-Urrutia. (Tr. 186-92). Plaintiff described experiencing significant family turmoil as a youngster. (Tr. 186-87). Plaintiff exhibited "impaired" attention, concentration, insight, and judgment, but her thought process was "logical, coherent, and relevant" and there was no evidence that she experienced "perceptual disturbances." (Tr. 191). Plaintiff's gait was "normal and coordinated" and her posture was "normal and erect." (*Id.*) The doctor diagnosed Plaintiff with: (1) post-traumatic stress disorder, chronic; and (2) major depressive disorder, recurrent, severe without

psychotic features.  (Tr. 192).  Plaintiff's GAF score was rated as 48.[1]  Plaintiff was prescribed therapy and medication.  (*Id.*)

On February 21, 2001, Plaintiff reported to Dr. Castro-Urrutia that her medications were "really helping her." (Tr. 223).  The doctor increased the dosage of Plaintiff's medication.  (Tr. 222).  On March 27, 2001, Plaintiff reported that she was "a little bit better."  (Tr. 219).  On April 16, 2001, Plaintiff reported to Dr. Castro-Urrutia that she was "feeling better" and "things have started to click in place."  (Tr. 217).

On May 23, 2001, Plaintiff was examined by Dr. Abelardo Pena-Ramos, a colleague of Dr. Castro-Urrutia. (Tr. 215).  Plaintiff was "friendly and cooperative" and "related well" to the doctor.  Her speech was "clear" and "coherent" and her thought process was "logical, coherent, and relevant."  The doctor observed no evidence of cognitive or intellectual deficits.  Plaintiff reported that her medication was "helping her" and that she "spends her time doing different things."  (*Id.*)

A July 7, 2001 examination by Dr. Castro-Urrutia revealed that Plaintiff's attention, concentration, insight, and judgment were all improved. (Tr. 213).  An August 16, 2001 examination revealed that Plaintiff's mood was "good" and her thought process "focused and goal directed."  (Tr. 212).

On March 26, 2002, Plaintiff was examined by Dr. Clyde McLane, a colleague of Dr. Castro-Urrutia. (Tr. 208-09).  Plaintiff reported that her medication has helped her "tremendously." (Tr. 208).  Her mood was "good" and her thought process was "focused and goal directed."  She

---

[1] The Global Assessment of Functioning ("GAF") score refers to the clinician's judgment of the individual's overall level of functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 1994) (hereinafter DSM-IV).  A GAF score of 48 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning."  DSM-IV at 34.

exhibited no evidence of perceptual or cognitive deficits and her insight and judgment were "adequate." (*Id.*) The doctor diagnosed Plaintiff with: (1) post-traumatic stress disorder, chronic; and (2) major depressive disorder, recurrent, severe without psychotic features, in full remission. (Tr. 207). Dr. McLane reiterated this diagnosis following a July 30, 2002 examination. (Tr. 204-05).

Plaintiff began treating with Dr. Jeff Toner on October 8, 2002, and treated with him through at least June 10, 2003. (Tr. 416). On or after June 10, 2003, Dr. Toner completed a report regarding Plaintiff's ability to perform work-related activities. (Tr. 416-18). The doctor reported that Plaintiff can frequently lift/carry up to 10 pounds. (Tr. 417). The doctor further reported that during an 8-hour workday, Plaintiff can stand for only 1.5 hours. With respect to Plaintiff's ability to walk during the workday, the doctor's response is illegible. The doctor did not indicate the extent to which (if any) Plaintiff can sit during an 8-hour workday. The doctor also reported that Plaintiff cannot use her right upper extremity to perform any reaching, pushing/pulling, or fine manipulation activities. (*Id.*)

On January 11, 2003, Plaintiff participated in a consultive examination conducted by Dr. Jeffrey Schipkey. (Tr. 269-72). Plaintiff reported that she was experiencing pain due to her arthritis. (Tr. 269). An examination of Plaintiff's extremities was unremarkable with no evidence of bony deformities, edema, tenderness, erythema, effusion, or weakness. (Tr. 270-72). Plaintiff exhibited normal range of motion throughout her extremities, including her hands. (*Id.*) The doctor observed no evidence of rheumatoid nodules, ulnar deviation, interosseous atrophy, muscle wasting, or neurological deficit. (Tr. 272). Plaintiff was able to squat, hop, and heel/toe walk without difficulty. She was able to bend forward and touch her toes without difficulty. Dr. Schipkey

9

concluded that Plaintiff's "physical exam is extremely unremarkable." He further observed that Plaintiff exhibited "extremely poor patient effort." (*Id.*)

On April 14, 2003, Plaintiff reported to her therapist that she enjoys working in her yard, arranging flowers, and performing arts and crafts. (Tr. 330).

X-rays of Plaintiff's right shoulder, taken on May 12, 2003, were "negative" with no evidence of fracture or abnormality. (Tr. 380). X-rays of Plaintiff's cervical spine, taken on May 27, 2003, revealed the presence of degenerative disc disease, but "no evidence of acute abnormality." (Tr. 382).

On July 28, 2003, Plaintiff was examined by Dr. Sosa Kocheril, with the University of Michigan Rheumatology Clinic. (Tr. 436-38). Plaintiff reported that she was experiencing pain in her neck, back, and shoulders. (Tr. 436). Plaintiff exhibited normal reflexes and there was no evidence that she was experiencing any neurological deficits. (Tr. 437). An examination of Plaintiff's hands revealed no evidence of synovitis, inflammation, tenderness, erythema, effusion, or limitation of movement. (*Id.*) X-rays of Plaintiff's hands revealed no evidence of an "erosive arthropathy." (Tr. 439). An examination of Plaintiff's extremities revealed 4/5 strength on the right and 5/5 strength on the left. (Tr. 437). Tinel's sign was negative.[2] Plaintiff exhibited "decreased" range of motion in her shoulders. An examination of Plaintiff's back revealed "minimal" tenderness over the SI joint. An examination of Plaintiff's hips revealed "minimal" tenderness with no evidence

---

[2] Tinel's test (or Tinel's sign) refers to a tingling sensation at the end of a limb produced by tapping the nerve at a site of compression or injury. This test is also used to detect the presence of carpal tunnel syndrome. J.E. Schmidt, SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE T-140 (Matthew Bender) (1996); Frank L. Urbano, M.D., *Tinel's Sign and Phalen's Manuever: Physical Signs of Carpal Tunnel Syndrome*, HOSPITAL PHYSICIAN, July 2000, at 39.

of effusion or erythema. Straight leg raising was negative and an examination of Plaintiff's fibromyalgia trigger points was "negative." (*Id.*)

On August 25, 2003, Plaintiff was examined by Dr. Kocheril. (Tr. 432-33). A musculoskeletal examination revealed "decreased" range of motion in Plaintiff's right shoulder, but the results of the examination were otherwise unremarkable with no evidence of "synovitis, inflammation, tenderness, erythema, or effusion of any joints." (Tr. 433). Subsequent x-rays of Plaintff's right shoulder revealed "mild" degenerative changes, but "no other bony or articular abnormality." (Tr. 429). Plaintiff also participated in an EMG examination, the results of which were "normal" with no evidence of cervical radiculopathy, plexopathy, median neuropathy at the wrist, or carpal tunnel syndrome. (Tr. 434).

On September 23, 2003, Plaintiff participated in an MRI examination of her cervical spine, the results of which revealed degenerative changes without evidence of spinal stenosis or signal abnormality. (Tr. 391).

On September 26, 2003, Plaintiff participated in a nerve conduction study of her lower extremities, the results of which were "normal" with "no electrodiagnostic evidence of radiculopathy, mononeuropathy, plexopathy, or polyneuropathy." (Tr. 430-31).

On October 6, 2003, Plaintiff was examined by Dr. McLane. (Tr. 359-60). The results of a mental status examination were unremarkable. (Tr. 359). Plaintiff reported that she was "thinking about" returning to the work force. (*Id.*) The doctor diagnosed Plaintiff with: (1) post-traumatic stress disorder, chronic; and (2) major depressive disorder, recurrent, severe without psychotic features, in full remission. (Tr. 360).

11

On November 1, 2003, Plaintiff participated in an MRI of her pelvis, the results of which revealed "minimal" bursitis. (Tr. 414). X-rays of Plaintiff's cervical spine, taken on December 18, 2003, revealed "degenerative change of the low cervical spine." (Tr. 386). X-rays of Plaintiff's right knee, taken on January 15, 2004, were "negative" with no evidence of fracture, dislocation, or osseous or soft tissue abnormality. (Tr. 387).

At the administrative hearing, Plaintiff testified that she experiences constant pain in her back, hip, neck, shoulders, arms and hands. (Tr. 480-81). According to Plaintiff, her pain is often so severe that it is exacerbated by any movement. (Tr. 481). Plaintiff testified that she constantly experiences depression and is unable (due to nerves and anxiety) to visit with anybody. (Tr. 487-88). She testified that on a "good" day she may be able to perform a little cleaning, but is otherwise bed ridden. (Tr. 490-91). Plaintiff testified that she experiences difficulty gripping (and carrying) items and performing fine motor skill activities. (Tr. 493-94).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[3] If the Commissioner can make a

---

[3] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. § 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. § 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. § 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. § 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a non-exertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

B. **The ALJ's Decision**

The ALJ determined that Plaintiff suffers from the following severe impairments: (1) osteoarthritis, (2) depression, and (3) post-traumatic stress disorder. (Tr. 24). The ALJ further determined that these impairments, whether considered alone or in combination, fail to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (*Id.*)

With respect to Plaintiff's residual functional capacity ("RFC"), the ALJ determined that Plaintiff retained the capacity to perform light work subject to the following limitations:[4] (1) she can lift/carry up to 10 pounds frequently and up to 20 pounds occasionally, (2) she requires a sit-stand option, (3) she cannot perform repetitive bending, squatting, kneeling, crawling, or climbing, (4) she cannot perform forceful gripping or grasping activities with either upper extremity, (5) she cannot perform repetitive pushing or pulling, (6) she cannot work at unprotected heights, (7) she can only perform jobs which permit her to be late or absent one time per month, (8) she can only perform jobs which are low stress and do not impose production quotas. (Tr. 27). Based on this RFC, as well as the testimony of a vocational expert, the ALJ determined that while Plaintiff was unable to

---

be performed (20 C.F.R. § 404.1520(f)).

[4] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A. 1983).

perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 27-29). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ Failed to Properly Evaluate the Opinion of Plaintiff's Treating Physician

As noted, Plaintiff was treated by Dr. Jeff Toner from October 8, 2002, through at least June 10, 2003. (Tr. 416). Dr. Toner's June 10, 2003 Report indicated Plaintiff retained the ability to perform work related activities, such as carrying or lifting up to 10 pounds. (Tr. 416-17). Dr. Toner further reported that during an 8-hour workday, Plaintiff can stand for only 1.5 hours. Concerning Plaintiff's ability to walk during the workday, however, Dr. Toner's response is illegible. He did not indicate the extent to which (if any) Plaintiff can sit during an 8-hour workday. Finally, Dr. Toner reported that Plaintiff cannot use her right upper extremity to perform any reaching, pushing/pulling, or fine manipulation activities. (*Id.*)

The parties do not dispute that Dr. Toner qualifies as a "treating physician" as that term is defined by the relevant Social Security regulations. The opinion expressed by Dr. Toner is inconsistent with the ALJ's conclusion that Plaintiff retains the ability to perform a limited range of light work. While the ALJ obviously rejected Dr. Toner's opinion, he failed to articulate *any* rationale for doing so.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions

14

and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Nonetheless, the ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286-87 (6th Cir. 1994); *Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health & Human Servs.*, 1991 WL 229979 at *2 (6th Cir. Nov. 7, 1991) (citing *Shavers v. Sec'y of Health & Human Servs.*, 839 F.2d 232, 235 n.1 (6th Cir. 1987));.

As the Sixth Circuit recently made clear, however, when an ALJ chooses to accord less than controlling weight to the opinion of a treating physician, he must adequately articulate his rationale for doing so. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-47 (6th Cir. 2004). As the *Wilson* court held:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors -- namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source -- in determining what weight to give the opinion.
>
> Importantly for this case, the regulation also contains a clear procedural requirement: "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." A Social Security Ruling explains that, pursuant to this provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* at 544 (internal citations omitted).

As the *Wilson* court further held, failure to comply with this requirement is not subject to harmless error analysis. *Id.* at 546-47. As the court expressly stated:

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely . . . To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.

*Id.* at 546 (internal citations omitted).

As previously noted, the ALJ failed to articulate any rationale for his decision to accord less than controlling weight to Dr. Toner's opinion. In light of the fact that the doctor's opinion is inconsistent with the ALJ's RFC determination, the ALJ's failure is not insignificant. The ALJ's failure in this regard clearly violates the principle articulated in *Wilson*.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and immediately award benefits if all essential factual issues have been resolved and proof of disability is compelling). Despite the ALJ's failure to comply with the relevant legal standard, there is no compelling evidence that Plaintiff is disabled. The Commissioner's decision must, therefore, be reversed and this matter remanded for further factual findings, including but not necessarily limited to, the proper consideration of the opinions expressed by Dr. Toner.

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision does not conform to the proper legal standards and is not supported by substantial evidence. The Court further concludes, however, that there is no compelling evidence that Plaintiff is disabled. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. A Judgment consistent with this Opinion will enter.

|  |  |
|---|---|
| DATED in Kalamazoo, MI:<br>April 10, 2006 | /s/ Richard Alan Enslen<br>RICHARD ALAN ENSLEN<br>SENIOR UNITED STATES DISTRICT JUDGE |